[Cite as *Webber v. Dept. of Pub. Safety*, 2017-Ohio-9199.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Alice Webber, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 17AP-323 |
| v. | : | (Ct. of Cl. No. 2015-00449) |
| Ohio Department of Public Safety, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 21, 2017

**On brief:** *John J. Gill*, for appellant.

**On brief:** *Michael DeWine*, Attorney General, and *Velda K. Hofaker*, for appellee. **Argued:** *Velda K. Hofaker*.

APPEAL from the Court of Claims of Ohio

SADLER, J.

{¶ 1} Plaintiff-appellant, Alice Webber, appeals from the judgment entry of the Court of Claims of Ohio granting the motion for summary judgment filed by defendant-appellee, Ohio Department of Public Safety ("ODPS"). For the following reasons, we reverse the decision of the Court of Claims of Ohio and remand the matter for further proceedings.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellant, at all relevant times an assistant director for the Lorain County Emergency Management Agency, initiated suit against appellee alleging claims of defamation, civil conspiracy, negligent infliction of emotional distress, and negligent supervision arising from alleged statements made by appellee's employees and/or agents

regarding appellant's response to a major 2014 flooding event.  Appellant concurrently moved for an immunity decision, pursuant to R.C. 2703.42(F), as to five employees of appellee or its agencies, Bridgette Bouska, Laura Adcock, Nancy Dragani, Andrew Elder, and Sima Merick.  The Court of Claims dismissed all but the defamation count of the complaint, which serves as the basis for the instant appeal.

{¶ 3}  Under the defamation count of her complaint, appellant alleged that on or around May 14, 2014, Bouska, an individual assistance specialist employed by the Ohio Emergency Management Agency ("Ohio EMA"), provided false, defamatory statements to other individuals and entities, including other agents and/or employees of appellee including, but not limited to, Bouska's supervisor (Adcock), the director of the Ohio EMA (Dragani) and her deputy at the time (Merick), and the operations administrator for the Ohio EMA (Elder).  According to the complaint, those statements "accuse[d] [appellant] of being a racist, discriminatory, biased, and/or prejudiced, and refusing or failing to perform her job duties based on the ethnicity of individuals."  (Second Am. Compl. at 2.) The complaint specifies among the defamatory statements made by Bouska are accusations appellant did not perform her job duties in assessing flood damage in certain communities because there are "Spanish people there."   (Second Am. Compl. at 3.) Appellant references as an exhibit appellee's administrative investigation report authored by Kathleen Botos.  The investigation report documents Botos' investigation into Bouska's allegation that appellant made "offensive" comments that certain areas of Lorain County were not assessed due to the ethnicity of the residents and Bouska's persistence that appellant made such comments despite an audio recording of appellant's telephone conversation with Bouska, which proved appellant never made those statements.  (Second Am. Compl. at 2.)

{¶ 4}  The complaint further alleges appellee's agents and/or employees "received and repeated the defamatory comments and caused the defamatory statements to be circulated to others" and specifically "published and repeated the allegations that [appellant] had not performed her job duties based upon alleged prejudice by [appellant] towards certain ethnicities."  (Second Am. Compl. at 3.)   Ultimately, the defamatory "information was published to, among others, [appellant's] employer."   (Second Am. Compl. at 3.)  Appellant alleges the statements against her "were made maliciously and

with intent to harm [appellant]" and "constitute defamation per se as they tend to injure [appellant] in her trade or occupation by accusing her of not doing her job because of personal prejudice or bias against race and/or ethnicity" or, alternatively, appellant suffered special damages. (Second Am. Compl. at 3.) Appellee answered by denying the allegations of the complaint and asserting, among other defenses, entitlement to an absolute or qualified privilege.

{¶ 5} On February 14, 2017, appellee moved for summary judgment on appellant's defamation claim and the immunity issue. According to appellee, appellant's defamation claim fails because (1) the statements appellant claims were made about her are not defamatory, (2) even if employees of appellee did call her racist, it would not be actionable because it is "merely a matter of opinion," (3) "accusing someone of being discriminatory is not defamation per se because the term 'racist' has been so overused and watered down that it simply has no ascertainable meaning [and,] [t]herefore, it is not injurious to one's trade or profession," (4) because the statement itself is ambiguous and does not implicate appellant as being racist, the "innocent construction rule" prevents liability to attach, and (5) any allegedly defamatory comments are entitled to a qualified privilege. (Mot. for Summ. Jgmt. at 1, 2.) Furthermore, appellee contended appellant is not entitled to an immunity determination because she has failed to state a claim for relief and because the undisputed facts demonstrate the named employees are entitled to immunity as a matter of law. Appellee's motion for summary judgment is supported by the affidavits of Bouska, Adcock, Dragani, Elder, Merick, and Botos.

{¶ 6} Bouska averred information provided to her on "street sheets," which document properties affected by the flood, the severity of damage, and insurance coverage, raised several concerns with her. (Bouska Aff. at 2.) Bouska was concerned with whether residents had been asked if they carried flood insurance and was concerned why some information on the street sheets did not match the information the Ohio EPA already had about the flooding event. Bouska spoke to appellant by telephone in order to receive more information and clarification on the areas assessed for damage. The call, in pertinent part, went as follows:

> [Appellant:] [W]e actually have, that I know of, four different low-income apartment buildings.

[Bouska:]  Ok.

[Appellant:]  The other one is called Tower Boulevard.

[Bouska:]  Ok.  But those showed up on the PDA (Preliminary Damage Assessment)?

[Appellant:]  Yes.

[Bouska:]  So we're good with those.

[Appellant:]  Ok. So, and that's Spanish speaking, and that's um, very low income, Tower Boulevard.

[Bouska:]  Ok now, these 16 units at this other complex [Pearl Village Apartments], how much damage was there?

[Appellant:]  The same amount as the, um, Sheffield Estates.

[Bouska:]  About three to four inches?

[Appellant:]  Yes.  But they're very limited resources and things like that.  So,

[Bouska:]  Ok.  Were those, those also garden units?

[Appellant:]  Yes, and so was Tower Boulevard.

[Bouska:]  Ok.

[Appellant:]  Now there may have been, there may have been one unit at Tower Boulevard, I don't know how many units were actually reported.

[Bouska:]  Ok.

[Appellant:]  But um, I had one of the residents call me today and said that the manager said she was going to do the cleanup, she came in and, but you know how residents are, they say that floor is still wet, they'll, smells really bad and um, you know these are some disabled people, in both of these, in all four of these units.

[Bouska:]  Ok.  Has anyone taken a look at these?

[Appellant:]  Um, well, we did yesterday.  Took a look at the Tower Boulevard ones, but like they, but why they showed up on the reports.  Red Cross went out to the Sheffield Estates and Pearl Village one yesterday.

[Bouska:]  Ok.

[Appellant:]  And they didn't do a full blown [damage assessment], but they, they opened up a shelter just for these residents.  Hardly anyone showed up, they just, you know people don't want to go to shelters.

[Bouska:]  Right.

[Appellant:]  They stayed there, in the units, um but Red Cross said that, you know, they're trying to deal with what they can.  They handed out some clean-up kits.

[Bouska:]  Ok.  All right.  Um, Alice, we may have to do some more follow-up on this, somebody may actually have to go look at these.

[Appellant:]  That's what I was thinking about.  Calling my damage assessment team in, and actually, 'cause another, the other one is right beside Sheffield Estates.  It's just around the block.

* * *

[Bouska:]  * * * So basically Sheffield Township hasn't been done yet?

[Appellant:]  Right, by us.

* * *

[Bouska:]  Ok.  All right.  Ok Alice, make sure when you're going out you're asking the proper insurance question.  And I know you know that that's asking if they have flood insurance.

[Appellant:]  Right.

* * *

> [Bouska:] * * * And if you could follow-up with that, and I'll put in for the briefing at 9:30 that the, you're, the county is going to follow-up with the um, Sheffield.
>
> [Appellant:]  Yes.  We'll get back out and do the Sheffield ones.
>
> [Bouska:]  Ok.  Thanks, Alice.

(May 14, 2014 Telephone Call at 9:03 a.m.)

{¶ 7}  Bouska averred after the call with appellant, she contacted her own supervisor, Adcock, and, among other exchanges of information, "mentioned that certain of these areas had not been assessed because they had Spanish-speaking residents who did not speak English."  (Bouska Aff. at 5.)  Bouska averred "[t]hese are populations that we are required to give special consideration," and she was "very upset and concerned after speaking with [appellant] that some of the most vulnerable of our  citizens were not part of the local damage assessment and might not receive the assistance they needed."  (Bouska Aff. at 3, 7.)  According to Bouska, "I never told anyone that [appellant] made the decision not to assess areas because the residents were Hispanic or spoke Spanish," "never referred to [appellant] as a racist or accused her of discrimination," and "sincerely believed that one of the reasons that these areas were not assessed was because the people did not speak English."  (Bouska Aff. at 5.)

{¶ 8}  As a result of these concerns, Adcock told Bouska to go to Lorain County and complete the preliminary damage assessment ("PDA").  Bouska left a message with appellant that she would like to come to Lorain County to "help her do the other three complexes in Sheffield Township."  (May 14, 2016 Telephone Call at 9:28 a.m.)  According to Bouska, although Bouska thought a translator would be available to assist with the assessments, no translator was available, and Bouska utilized her own basic Spanish knowledge to speak with one person.  Bouska averred "[t]here were indeed Spanish-speaking people in the areas that had not been assessed."  (Bouska Aff. at 6.)  She adds that "[n]othing about my work in Lorain County made me believe that the fact that people did not speak English was not one of the reasons these areas were not initially assessed."  (Bouska Aff. at 6.)

{¶ 9}  According to Bouska, she was initially interviewed twice as part of an administrative investigation of two Ohio EMA field investigators, Cathy Deck and Leslie Bricker, who assisted with the flood assessment.  During a third interview, Bouska was told she was now the subject of the administrative investigation after the lead investigator listened to the recording of her phone conversation with appellant and confirmed appellant had not said the areas were not assessed because of the presence of Spanish-speaking people.  Bouska was charged in a disciplinary action with presenting false or misleading information during the course of the investigation.  In her affidavit, Bouska states she has "since had the opportunity to carefully review the transcript of the telephone conversation and I recognize that I did misunderstand which area [appellant] had referred to as Spanish-speaking."  (Bouska Aff. at 7.)  Bouska characterizes the incident as a mistake, insists she has "not made disparaging statements about [appellant], nor have I heard any other ODPS employees do so," and says she never said anything about the phone conversation with appellant to anyone beyond her co-workers at the Ohio EMA, aside from those involved in the investigation in her own disciplinary action.  (Bouska Aff. at 8.)  Bouska "acted in good faith and without malice" toward appellant, whom she did not know prior to this incident.  (Bouska Aff. at 8.)

{¶ 10} Adcock averred Bouska advised at least one of the areas not assessed and not reported on the street sheets had Spanish-speaking residents.  Adcock did not know whether Deck or appellant gave this information to Bouska.  Adcock received a phone call from appellant asking if Bouska had left Columbus yet, and appellant indicated that she hoped Bouska had left.  Adcock asked appellant if they had Spanish-English translators available to assist Bouska with the assessment, and appellant indicated she could have a translator available and did not indicate a translator would not be needed for the areas that still had to be assessed.

{¶ 11} Adcock further averred Bouska never told her appellant "made a decision not to assess areas of Lorain County because she was discriminating against the Spanish-speaking population," Bouska and Adcock never called appellant "a racist or made any similar statement," and Adcock was not "aware of any ODPS employee who ever made any statements that [appellant] was a racist or discriminating against Spanish-speaking people."  (Adcock Aff. at 4.)  Adcock adds is it her understanding the director's office

referred several concerns related to this flooding event to the Administrative Investigations Unit ("AIU"), and "[o]nce a matter is referred to the AIU, employees are not to discuss it, so I did not."  (Adcock Aff. at 4.)  Adcock reiterates that she "did not discuss this matter or [appellant] with anyone outside the ODPS, nor do I have knowledge that anyone from the ODPS did so."  (Adcock Aff. at 4.)  Adcock "did not bear any ill-will toward [appellant]" and "[e]verything [Adcock] did relative to this matter was part of [her] job duties and responsibilities."  (Adcock Aff. at 5.)

{¶ 12} Dragani averred she "never referred to [appellant] as a racist or said that she discriminated against a population," "never made any disparaging comments about [appellant]," and "did not conclude based upon what [she] was told by [her] subordinates that [appellant] was a racist or acted in a discriminatory manner."  (Dragani Aff. at 4.) According to Dragani, Bouska followed the proper protocol by bringing her concerns about the PDA done in Lorain County to the attention of her direct supervisor and Dragani.  Dragani averred she acted in good faith and without ill will toward appellant.

{¶ 13} Elder averred that "[a]t no time did [he] hear anyone from ODPS refer to [appellant] as a racist or accuse her of being discriminatory," that he had known appellant for many years and never thought she was racist or discriminatory, and that he "did not make any disparaging comments about the way [appellant] did her job, nor [had he] heard any other ODPS employee make any such comments."  (Elder Aff. at 2, 3.)  He avers that his actions "were completely in line with [his] duties as an employee of ODPS," that he did not have any ill will or malice toward appellant, and that he acted in good faith to execute his professional duties.  (Elder Aff. at 3.)

{¶ 14} Merick recalled Dragani relaying concerns over the PDA done in Lorain County, including a mismatch of information on the street sheets and verbal reports and questions over whether the proper insurance question had been asked.  Dragani advised Bouska had reported an area with Spanish-speaking residents that had experienced significant flooding were not on the street sheets.  Dragani and Merick decided to call the AIU for advice and that "[o]nce AIU begins reviewing a matter, we are not to discuss the matter or take further action."  (Merick Aff. at 2.)  According to Merick, at a meeting in November 2014, approximately four months after AIU had issued its report on the administrative investigation, Dragani and Merick met with appellant and her supervisor,

Thomas Kelley. At the meeting, appellant was "extremely hostile" toward Dragani and Merick and said the two "implied that she was prejudiced," which Dragani and Merick denied. (Merick Aff. at 3.)

{¶ 15} Merick further averred that aside from the November 2014 meeting, she has never discussed this matter with anyone outside of appellee, nor is she aware of any other employee of appellee doing so. According to Merick, she does have "reason to believe that [appellant] has discussed this matter with EMA employees in other counties based upon questions/comments [Merick] received from county EMA employees, particularly from northeast Ohio." (Merick Aff. at 4.) Merick avers she never referred to appellant as a racist or said she discriminated against a population and did not conclude, based on what she was told by subordinates, appellant was a racist or acted in a discriminatory manner and never heard any employee of appellee refer to appellant in this manner. According to Merick, she had known appellant for years and had no ill will toward her, and Merick acted in good faith in performing her job duties and responsibilities in this matter.

{¶ 16} Botos averred that on Dragani's report, she initiated an investigation into the conduct of the two field liaisons deployed to the Lorain County flooding event. Appellant was not the named subject of the investigation. In her affidavit, Botos states "[o]ne of the allegations being investigated was whether the two ODPS employees (Deck and Bricker) did not assess certain areas of Lorain County because there were Spanish speaking people there who did not speak English," since it would be a concern if an employee of appellee knew certain areas were not assessed and yet not intervened to make sure all flood damage was reported on the street sheets. (Botos Aff. at 2.) As a part of that investigation, Botos interviewed Bouska; Botos attempted to contact appellant but could not speak with her as appellant was on medical leave. Botos avers during her interview with Bouska, the "only statement * * * Bouska made about the Lorain County residents was that they were 'Spanish speaking' and did not speak English." (Botos Aff. at 4-5.)

{¶ 17} During the course of the investigation, the AIU was advised of a telephone call between Bouska and appellant regarding which areas of Lorain County had been assessed for damages and which areas had not been assessed. The calls were transcribed, and Botos "discovered that [appellant's] reference to Spanish-speaking people was with

regard to an area that had been assessed and reported on the street sheets," and, "[a]lthough [appellant] did state in the phone conversation that certain areas of Lorain County had not been assessed and had not been recorded on the street sheets, she did not state that it was because the people spoke Spanish, not English." (Botos Aff. at 3.)

{¶ 18} Botos decided to interview Bouska again and make her a subject of the investigation. Botos averred when Botos told Bouska about the recorded call, Bouska stated she had not lied, and she had accurately communicated her recollection of the conversation. Botos was upset that Bouska said she would stick with her statement even after being presented with the transcript of the telephone conversation. According to Botos, Bouska discussed the EMA is required to pay special attention to minority populations, poor, and disabled residents as they have the hardest time recovering from disasters. Botos asked Bouska "whether she felt that saying such a special population had not been assessed was a very serious allegation and [Bouska] agreed." (Botos Aff. at 3-4.) Botos then asked if Bouska thought to listen to the tape before reporting to her supervisor that areas with Spanish-speaking residents had not been assessed, and Bouska said she had not. Botos felt Bouska did not exercise due diligence by failing to ask appellant to clarify her statements or reviewing the recording, and ultimately concluded Bouska provided false or misleading information to the AIU, "even if not intentionally," relative to the street sheets and the areas of Lorain County that were not assessed. (Botos Aff. at 4.)

{¶ 19} In mid-July 2014, Botos spoke to Kelley by telephone. To Botos, "[i]t appeared that Mr. Kelly [sic] and [appellant] were already aware of the investigation as they indicated that they were upset that [appellant's] name was brought into it by reference to her telephone call with * * * Bouska." (Botos Aff. at 4.) Appellant and Kelley requested a copy of the final investigation report. In her affidavit, Botos states the use of the term "ethnicity" in the investigation report was her own description and was not a word used by Bouska or Dragani. (Botos Aff. at 5.)

{¶ 20} Botos averred to the truth and accuracy of her final administrative investigation report, which is attached to her affidavit as an exhibit. In the report, Botos documents the information provided by Bouska as follows:

> [W]hen Bouska questioned [appellant] as to why [three buildings] had not been assessed, [appellant] told her,

"Because there are Spanish people there." Bouska reported that she did not respond, and that [Bouska's] eyes "watered up" because she was hurt by [appellant's] comment. [Appellant] then allegedly told Bouska, "Well, none of them spoke English."

(Adm. Investigation Report at 3.)  In her report, Botos writes Bouska repeatedly reported this version of the conversation, Bouska "insisted that comments made by [appellant] were offensive," the two discussed which comments were offensive, and Bouska acknowledged "the allegations she made against [appellant] were very serious."  (Adm. Investigation Report at 5.)

{¶ 21} According to Botos' report, when Botos interviewed the field liaisons, "[t]hey strongly denied ever hearing [appellant] make any inappropriate comments about residents' race, ethnicity, or ability to speak English" and "could not imagine [appellant] saying something similar to what was alleged."  (Adm. Investigation Report at 3.)  Botos' report states "[appellant] did not make any of the comments Bouska attributed to her" and notes appellant's reference to Spanish-speaking residents was "not said in a derogatory or inappropriate manner."  (Adm. Investigation Report at 3, 4.)

{¶ 22} The administrative investigation report included several attachments, including the telephone call transcripts and a written statement from Bouska.  Appellee's motion for summary judgment additionally points to the deposition of appellant in which appellant agrees the administrative investigative report exonerates her and states no one has said to her, because of the investigation or incident in general, they believe she is a racist or their opinion of her went down.

{¶ 23} On March 13, 2017, appellant filed a memorandum contra summary judgment.  In it, appellant argues "this situation clearly involves an allegation that [appellant] did not perform her job duties because of bias or prejudice," which constitutes defamation per se.  (Memo. Contra at 4.)  Appellant argues Bouska "has changed her story" and points to Bouska's own statements through the investigation conducted by appellee and her statements made during the course of her disciplinary hearing, in which Bouska maintained in a written closing statement "I have a moral and ethical responsibility to report situations of bias/prejudice/discrimination.  I did just that." (Memo. Contra at 4.)  Appellant notes Bouska's statements formed the basis for one of the

administrative investigations entitled "Allegation #2," which involved the allegation that "[c]ertain communities within Lorain County were not assessed for damage because the residents there were minorities and did not speak English." (Adm. Investigation Report at 1.)

{¶ 24} Appellant further argues the statements made by Bouska are false and not opinion and that those false statements were then published by an employee or agent of appellee to appellant's supervisor, Kelley. An affidavit of Kelley is attached to the memorandum contra, which provides that Deck told him appellee was investigating appellant because appellant did not perform an aspect of her job duties because the people involved were "Puerto Rican and/or Spanish and/or spoke Spanish." (Kelley Aff. at 2.) This surprised Kelley because he had known appellant for many years and never knew her to be discriminatory or racist. Kelley separately avers "I took this situation very seriously as I was told that [appellant] discriminated against people and did not perform her job duties because of people's race or ethnicity." (Kelley Aff. at 3.)

{¶ 25} Also attached to the memorandum contra was the affidavit of appellant. In it, appellant avers "[a]t no time in [her] conversation with Bouska did [appellant] state or imply that certain aspects of [her] job were not performed because there were Spanish speaking people in that area." (Webber Aff. at 3.) Appellant states on returning from medical leave, Kelley "confronted [her] in his office regarding a state investigation of my conduct toward Hispanic populations." (Webber Aff. at 4.) Appellant details alleged effects this incident has had on her physical and mental health and job performance.

{¶ 26} On March 13, 2017, appellee filed a combined motion for leave to file a supplemental memorandum in support of appellee's motion for summary judgment and motion to strike. As the basis of the motion to strike, appellee contended the affidavits of appellant and Kelley are not based on personal knowledge and admissible evidence. Regarding appellant's reference to a document containing Bouska's statement during her disciplinary process, appellee contended appellant failed to authenticate the document or present it as an exception to the hearsay rules and, therefore, that document should be stricken as incomplete and not considered by the court. On March 20, 2017, appellant filed a memorandum in opposition to appellee's motion for leave or, in the alternative, a

motion for leave to file a reply and memorandum in opposition to appellee's motion to strike.

{¶ 27} On March 31, 2017, the Court of Claims issued a judgment in favor of appellee. The Court of Claims first granted appellee's motion for leave to file a supplemental memorandum in support of its motion for summary judgment and denied appellant's motion to strike appellee's motions.[1] The Court of Claims then granted appellee's motion for summary judgment.

{¶ 28} In doing so, the Court of Claims states:

> [Appellant] claims that Bouska uttered defamatory statements alleging that [appellant] did not perform her job duties because of bias or prejudice regarding "Spanish people" in the communities that were being assessed. [Appellee] argues that such statements do not impute bigotry to [appellant] and that and equally innocent construction is that the community was not assessed for damages because there may have been a language barrier in the Spanish-speaking community. The court agrees.
>
> In her deposition, [appellant] testified that she was aware that at least part of the area that was being assessed had Spanish-speaking residents. ([Appellant's] deposition, pages 115-116.) [Appellant] also acknowledged that she was asked by [appellee's] employees about the availability of a Spanish-English interpreter to assist with the assessment. [Appellant] admitted that she was not aware of anyone who had directly accused her of being a racist as a result of either the incident or the subsequent investigation. ([Appellant's] deposition, page 138.)
>
> Considering the context from which the statements arose, the court finds that, there is a reasonable innocent construction and, therefore, this construction must be adopted. Accordingly, the court finds that, as a matter of law, the statements at issue are not defamatory and [appellant] cannot prevail on her defamation claim.

(Mar. 31, 2017 Decision at 5-6.)

---

[1] We note the trial court did not expressly address or rule on appellee's motion to strike improper evidence. Where a court does not explicitly rule on a motion, it is presumed to have been denied. *Whitmer v. Zochowski*, 10th Dist. No. 15AP-52, 2016-Ohio-4764, ¶ 39, fn. 6.

{¶ 29} Regarding immunity of named individuals, the Court of Claims noted in its motion for summary judgment appellee presented evidence in support of immunity of its employees and appellant's memorandum contra failed to present any evidence or legal argument to support a contrary finding. Therefore, the Court of Claims found Bouska, Adcock, Dragani, Elder, and Merick are entitled to immunity pursuant to R.C. 9.86 and 2743.02(F), and the court of common pleas does not have jurisdiction over any civil actions that may be filed against them based on the allegations of this case.

{¶ 30} Appellant filed a timely appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 31} Appellant presents two assignments of error:

> 1. The trial court committed prejudicial error when it granted the motion for summary judgment by finding a reasonable innocent construction of the defamatory statements.
>
> 2. The trial court committed prejudicial error when it granted summary judgment and concluded that the employees of the Ohio Department of Public Safety referenced in the complaint were entitled to civil immunity.

## III. STANDARD OF REVIEW

{¶ 32} Pursuant to Civ.R. 56(C), summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978). "When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims." *Lundeen v. Graff*, 10th Dist. No. 15AP-32, 2015-Ohio-4462, ¶ 11, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). Once the moving party meets its initial burden, the nonmovant must set forth specific facts demonstrating a genuine issue for trial. *Dresher* at 293. The nonmoving party may not rest on the mere allegations and denials in the pleadings but,

instead, must point to or submit some evidentiary material that shows a genuine dispute over the material facts exists. *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

{¶ 33} Appellate review of summary judgment is de novo. *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-870, 2015-Ohio-2661, ¶ 12, citing *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5. "When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination." *Gabriel* at ¶ 12, citing *Byrd* at ¶ 5, citing *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 107 (10th Dist.1992).

## IV. DISCUSSION

### A. First Assignment of Error

{¶ 34} Under the first assignment of error, appellant contends the Court of Claims erred when it granted appellee's motion for summary judgment by finding a reasonable innocent construction of the defamatory statements. For the following reasons, we agree.

{¶ 35} "Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame or disgrace, or affecting the person adversely in his or her trade or business." *Knowles v. Ohio State Univ.*, 10th Dist. No. 02AP-527, 2002-Ohio-6962, ¶ 22. Generally, slander refers to spoken defamatory words and libel refers to written defamatory words. *Holley v. WBNS 10TV*, 149 Ohio App.3d 22, 2002-Ohio-4315, ¶ 29 (10th Dist.), citing *Retterer v. Whirlpool Corp.*, 111 Ohio App.3d 847, 857 (3d Dist.1996).

{¶ 36} To establish the prima facie case of defamation, a plaintiff must show (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the statement, and (5) the defendant acted with the required degree of fault. *Knowles* at ¶ 21, citing *Sweitzer v. Outlet Communications*, 133 Ohio App.3d 102, 108 (10th Dist.1999). "To survive a motion for summary judgment in a defamation action, a plaintiff must make a sufficient showing as to each of the five essential elements of the case." *Murray v. Knight-Ridder, Inc.*, 7th Dist. No. 02 BE 45, 2004-Ohio-821, ¶ 14. If a statement is defamation "per se," both damages and actual malice are presumed to exist. *Knowles* at ¶ 24; *Miller v. Cent. Ohio Crime Stoppers, Inc.*, 10th Dist. No. 07AP-669, 2008-Ohio-1280, ¶ 12-13 (noting

that actual malice will not be presumed if the defense of qualified privilege applies). Generally, "[a] statement will be considered defamation per se if the statement tends to injure a person in his or her trade, profession, or occupation." *Knowles* at ¶ 24; *Gilson v. Am. Inst. of Alternative Medicine*, 10th Dist. No. 15AP-548, 2016-Ohio-1324. As noted by the judgment of Court of Claims, Ohio courts have determined that "being referred to as racist may, at times, constitute defamation per se." *Lennon v. Cuyahoga Cty. Juvenile Court*, 8th Dist. No. 86651, 2006-Ohio-2587, ¶ 28.

{¶ 37} Whether certain statements alleged to be defamatory are actionable or not is a matter for the court to decide as a matter of law. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, ¶ 78, citing *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 372 (1983). In determining whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances, consider the statement within its context rather than in isolation, and determine whether a reasonable person would interpret that statement as defamatory. *Am. Chem. Soc.* at ¶ 79.

{¶ 38} The Court of Claims' decision in this case was based on the second prong of appellant's prima facie case: the lack of a defamatory statement. Specifically, the Court of Claims found that the statements made by employees of appellee were not defamatory as a matter of law under the innocent construction rule.

{¶ 39} This court has recognized that the Supreme Court of Ohio in *Yeager* adopted the innocent construction rule. *Holley* at ¶ 32. Under the innocent construction rule, if a statement is reasonably susceptible of both a defamatory and an innocent meaning, the innocent meaning must be adopted as a matter of law. *Id.*, citing *Yeager* at 372. Thus, " '[t]he rule protects only those statements that are *reasonably* susceptible of an innocent construction.' " (Emphasis sic.) *Roe v. Heap*, 10th Dist. No. 03AP-586, 2004-Ohio-2504, ¶ 46, quoting *McKimm v. Ohio Elections Comm.*, 89 Ohio St.3d 139, 146 (2000).

{¶ 40} We do not agree that the innocent construction rule applies in this case for two reasons. First, viewing the totality of the circumstances, Bouska's statement cannot be reasonably construed as merely relaying that a community was not assessed due to a language barrier issue. To Botos, Bouska described appellant's statements about Spanish-speaking people as "offensive" and talked about how her eyes watered up because she was

hurt by appellant's comment. (Adm. Investigation Report at 5.) Botos understood Bouska's allegation as accusing appellant of making an "inappropriate" or a "derogatory" comment and asked the field investigators about such inappropriate comments; the field investigators "could not imagine [appellant] saying something similar to what was alleged." (Adm. Investigation Report at 3, 4.) Kelley specifically avers that he "took this situation very seriously as I was told that [appellant] discriminated against people and did not perform her job duties because of people's race or ethnicity." (Kelley Aff. at 3.)

{¶ 41} Second, the statement that appellant did not assess certain areas affected by the flood because Spanish people are there, even stripped of any racist, bias, or prejudice meaning, is not an "innocent" construction on this record. It is undisputed appellee views its flood response to vulnerable populations as a serious matter and a priority. Bouska averred "[t]hese are populations that we are required to give special consideration [and that she was] very upset and concerned after speaking with [appellant] that some of the most vulnerable of our citizens were not part of the local damage assessment and might not receive the assistance they needed." (Bouska Aff. at 3, 7.) Bouska agreed the allegation she made about appellant is "very serious." (Botos Aff. at 3-4; Adm. Investigation Report at 5.) Such an allegation is so serious within this profession that it prompted appellee to conduct an administration investigation into the matter. Therefore, under the totality of the circumstances, even the construction appellee proposes is not reasonably susceptible to an innocent meaning in this case.

{¶ 42} As a result, appellee is not entitled to judgment as a matter of law on the basis of the innocent construction rule. The remainder of the prima facie case and applicability of appellee's defense of qualified privilege were not addressed by the Court of Claims and fall outside of the assignment of error posed to this court. *Huntington Natl. Bank v. Burda*, 10th Dist. No. 08AP-658, 2009-Ohio-1752, ¶ 21, citing App.R. 12(A)(1)(b) (stating "a court of appeals shall * * * [d]etermine the appeal on its merits on the assignments of error set forth in the briefs"). We remand the case to the Court of Claims to consider, in the first instance, the remainder of the prima facie case and appellee's defense of qualified privilege.

{¶ 43} Accordingly, appellant's first assignment of error is sustained.

### B.  Second Assignment of Error

{¶ 44} Under the second assignment of error, appellant contends the Court of Claims erred when it concluded the five employees of appellee referenced in the complaint were entitled to civil immunity.  For the following reasons, we disagree.

{¶ 45} "Whether a state employee is entitled to personal immunity from liability under R.C. 9.86 involves a question of law * * * over which the Court of Claims has exclusive, original jurisdiction."  *Wrinn v. Ohio State Hwy. Patrol*, 10th Dist. No. 11AP-1006, 2013-Ohio-1141, ¶ 9.   "While the issue of immunity is a question of law, consideration of the specific facts is necessary."  *Marinucci v. Ohio Dept. of Transp.*, 10th Dist. No. 99AP-500 (Jan. 18, 2000).  Matters of credibility should be resolved by the trial court.  *Id.*  "If the Court of Claims determines that the employee is immune from liability, the plaintiff in the underlying action must assert his or her claims against the state, not the employee."  *Wrinn* at ¶ 9, citing R.C. 2743.02(A)(2).  "[W]hether or not the elements of defamation were shown is irrelevant to an immunity determination."  *Marinucci.*

{¶ 46} R.C. 2743.02(F), the statutory provision regarding the state's waiver of immunity from liability, states:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the *officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner* shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.  The officer or employee may participate in the immunity determination proceeding before the court of claims to determine whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code.

(Emphasis added.)

{¶ 47} R.C. 9.86, "[c]ivil immunity of officers and employees," states:

> Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the

> plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, *unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.*
>
> This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law. This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743. of the Revised Code.

(Emphasis added.)

{¶ 48} "Malicious purpose encompasses exercising 'malice,' which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Wrinn* at ¶ 12, quoting *Caruso v. State*, 136 Ohio App.3d 616, 620 (10th Dist.2000). "Common law malice connotes hatred, ill will or a spirit of revenge." *Marinucci.* "Bad faith" generally implies or involves " 'actual or constructive fraud or a design to mislead or deceive another.' " *Wrinn* at ¶ 12, quoting *Caruso* at 621. " 'Bad faith is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.' " *Wrinn* at ¶ 12, quoting *Caruso* at 621. " 'Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result.' " *Wee Care Child Ctr., Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-1004, 2014-Ohio-2913, ¶ 29, quoting *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph three of the syllabus. " 'Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' " *Wee Care Child Ctr.* at ¶ 29, quoting *Anderson* at paragraph four of the syllabus.

{¶ 49} Appellant alleged in her complaint that "[t]he allegations against plaintiff were made maliciously and with intent to harm plaintiff." (Second Am. Compl. at 3.) In its motion for summary judgment, appellee produced affidavits of the named individuals

as evidence that the named individuals made, discussed, or relayed the statement regarding appellant to other employees of appellee in the course of the flood response or administrative investigation into the flood response. The named individuals also generally averred to acting in good faith and not harboring ill will toward appellant personally. Both Bouska and appellant stated they did not know each other prior to this incident. Throughout the incident and administrative investigation, Bouska adamantly maintained the truth of her recollection of her conversation with appellant until admitting to her misunderstanding and mistake in her affidavit.

{¶ 50} In her memorandum in opposition to summary judgment, appellant did not argue or point to evidence on this issue. For the first time on appeal, appellant argues Bouska imagined portions of a conversation that did not take place, none of the named individuals verified the conversations, and an administrative investigation was initiated in part due to the alleged discrimination on the part of appellant.

{¶ 51} We find appellee met its initial burden under Civ.R. 56 on the issue of immunity, and appellant failed to meet her reciprocal burden to set forth specific facts demonstrating a genuine issue for trial. *Dresher* at 293. Furthermore, appellant improperly presented her argument on immunity for the first time on appeal, and her argument was devoid of legal authority and citation to the record. *Tucker v. Leadership Academy for Math*, 10th Dist. No. 14AP-100, 2014-Ohio-3307, ¶ 20, quoting *Henson v. Cleveland Steel Container Corp.*, 11th Dist. No. 2008-P-0053, 2009-Ohio-180, ¶ 77 ("[W]hile this court's standard of review on a motion for summary judgment is de novo, that standard 'does not supersede [an appellate court's] settled practice of not addressing issues raised for the first time on appeal.' "); *Miller v. Johnson & Angelo*, 10th Dist. No. 01AP-1210, 2002-Ohio-3681, ¶ 2; *see also* App.R. 9 and 16(A)(7) ("[t]he appellant shall include * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."). Therefore, considering all the above, we find appellant's second assignment of error lacks merit.

{¶ 52} Accordingly, appellant's second assignment of error is overruled.

## V. CONCLUSION

{¶ 53} Having sustained appellant's first assignment of error and overruled appellant's second assignment of error, we reverse the judgment of the Court of Claims of Ohio and remand the matter to that court for further proceedings consistent with this decision.

*Judgment reversed*;
*cause remanded.*

TYACK, P.J., and LUPER SCHUSTER, J., concur.

_____