[Cite as *Newman v. Goodwill Columbus*, 2024-Ohio-5892.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Larry Newman, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 24AP-178 |
| v. | : | (C.P.C. No. 22CV-7648) |
| Goodwill Columbus, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 17, 2024

**On brief:** *Larry Newman*, pro se. **Argued:** *Larry Newman*.

**On brief:** *Williams & Finkbine Co., L.L.C.*, and *Susan S. R. Petro*, for appellee. **Argued:** *Susan S. R. Petro*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Larry Newman, acting pro se, appeals the judgment entered by the Franklin County Court of Common Pleas granting the motion for summary judgment filed by defendant-appellee, Goodwill Columbus ("Goodwill"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} Newman initiated an action against Goodwill asserting claims of negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation, defamation per se, and false light arising from alleged statements made by Goodwill employees related to events involving Newman in July and November 2021 at the Goodwill Outlet Store located on Brice Road in Columbus, Ohio (hereinafter "thrift store"). The trial court granted in part and denied in part Goodwill's Civ.R. 12(B)(6) motion to dismiss, finding Newman had sufficiently stated claims for all but his intentional infliction

of emotional distress claim.  Pursuant to Goodwill's motion for summary judgment, the trial court dismissed Newman's remaining claims.  On appeal, Newman challenges only the dismissal of his defamation claims.

{¶ 3}  In his amended complaint filed December 25, 2022, Newman set forth a lengthy narrative concerning the events underlying his lawsuit.  Newman alleged that in 2018, he expanded his two-decade hobby of collecting vintage items from thrift stores into part-time self-employment as an online vintage reseller.  The thrift store became his primary thrifting location.  His success as a vintage reseller was derived exclusively from income he received reselling items he found at the thrift store.

{¶ 4}  In July 2021, Newman began full-time self-employment as an online vintage reseller, spending 40-50 hours per week shopping at the thrift store.  Newman's success in obtaining vintage items, particularly clothing, irritated other thrift store customers who shopped primarily for vintage clothing, with some becoming openly hostile toward Newman.  On July 18, 2021, a male customer intentionally pushed Newman.  Later that day, another male customer threatened Newman's life.  After learning from several other customers that these two men had been making false accusations against him, Newman decided to start recording his interactions with Goodwill employees and customers.

{¶ 5}  On July 22, 2021, while inside the thrift store, Newman videotaped a conversation he had with the man who had threatened his life.  Newman alleged that during this conversation, the man accused Newman of threatening to kill him and insinuated that Newman had mental health problems.  Brianna Mullens, a Goodwill employee, intervened in the discussion; according to Newman, she immediately took the other man's side, stated she did not care that the other man had threatened Newman's life and was only concerned that Newman had videotaped the man inside the thrift store.

{¶ 6}  Newman subsequently reported to Mullens and another Goodwill employee, identified only as "Maria," that the two customers had threatened him.  (Am. Compl. at ¶ 30.)  Mullens and Maria told Newman they could not help him because they did not witness the alleged threats and that thrift store policy precluded them from getting involved. Later that day, Maria ordered Newman to leave the thrift store after she overhead a loud conversation between him and another customer.  Newman informed Maria and Mullens that he needed the surveillance footage of the incidents with the two male

customers.  Newman was advised to speak to the thrift store manager, Bruce Weisel, the next day.

{¶ 7}    Later that evening, Newman returned to the thrift store parking lot and began videotaping; Newman's video depicted Maria leaving the thrift store.  Newman observed Maria standing by her car, staring at Newman while talking on the phone; Newman did not speak to her.  Maria then walked to a nearby retail store and allegedly reported to an unidentified man that Newman was stalking her in the parking lot.  The man confronted Newman about the alleged stalking; Newman responded that he was simply documenting his experience of being bullied inside the thrift store.

{¶ 8}    The next day, July 23, 2021, Newman spoke to Weisel, who averred that thrift store customers, along with Mullens and Maria, had reported being harassed by Newman. Newman denied the allegations and told Weisel he needed surveillance footage from the thrift store to support his version of events.  Weisel was uncooperative and warned Newman to "stop causing problems" at the thrift store. (Am. Compl. at ¶ 38.)

{¶ 9}    On July 24, 2021, Newman and another male customer had a conversation about the customer spreading gossip about Newman.  The man involved Maria in the conversation; Maria accused Newman of causing problems in the thrift store and threatened to kick him out if he did not follow her orders.  Newman left the thrift store without further incident.  He returned to the thrift store parking lot later that evening to shoot footage of the sunset.  While Newman was in the parking lot, Goodwill store manager Heather Talbott approached him and told him she would make him leave the thrift store if he caused any problems.  After Talbott refused to help Newman obtain surveillance footage from the thrift store, he went inside the store.  One of the customers told Newman that another customer was making malicious statements about him; when Newman confronted the man, Talbott intervened and ordered Newman out of the thrift store because he was videotaping the customer.

{¶ 10}  On July 27, 2021, Newman spoke by telephone to Mark Trimmer, Goodwill's head of security, about the incidents at the thrift store.  Trimmer refused Newman's request to provide him security footage of the incidents and told Newman he would provide the footage only to police.  Trimmer refused Newman's further attempts to obtain the security footage.

{¶ 11} Dissatisfied with Goodwill's responses, Newman concluded it was necessary to discover the identities of the thrift store customers who had threatened and harassed him. To that end, he created a flyer offering a reward for information about the individuals and distributed it to customers in the thrift store parking lot. When the flyer proved unsuccessful in identifying the individuals, Newman filed a public records request with the Columbus Division of Police. Through that request, Newman learned that Talbott and several thrift store customers had filed "false" police reports about him. (Am. Compl. at ¶ 49.) According to the complaint, Talbott lied and mischaracterized Newman's behavior; her interaction with the police officer was captured on the officer's body-worn camera.

{¶ 12} After learning about the police reports, Newman feared for his safety and stopped shopping at the thrift store for several months. He returned to the thrift store on November 5, 2021; Mullens immediately ordered him to leave, citing the alleged stalking incident involving Maria on July 22, 2021. Newman denied the stalking allegation, stating he had video evidence to disprove it. Later that day, Newman returned to the thrift store, but was denied an opportunity to speak with a manager; he then left.

{¶ 13} After Newman left the thrift store on November 5, 2021, police arrived and interviewed Goodwill customers and employees; Newman obtained body-worn police camera footage of those interviews. Newman alleged that the footage depicts an unidentified Goodwill employee making false accusations about Newman as well as Goodwill employee Candace Buchanan falsely accusing Newman of trespassing in the thrift store prior to November 5, 2021 and of having a mental illness. On November 12, 2021, Trimmer informed Newman he was permanently banned from the thrift store; Newman has not returned to the thrift store since that date.

{¶ 14} Under the defamation count of his amended complaint, Newman alleged that Goodwill employees defamed him by fabricating allegations about him stalking, harassing and threatening employees and customers, by falsely characterizing him as a threatening person who posed a danger to Goodwill employees and customers, by intentionally misrepresenting his self-protective actions as a documentary filmmaker, and by sharing their false allegations with Goodwill employees via email and the posting of documents throughout the thrift store. Newman further alleged Goodwill employees defamed him by providing false and misleading statements to police. Newman alleged that Goodwill employees acted with actual malice because they acted with both intentional and reckless

disregard as to the truth or falsity of their statements. Newman further alleged that because Goodwill employees acted with actual malice, their statements to police were entitled only to qualified, not absolute, privilege. Newman also alleged that the false allegations made by Goodwill employees have damaged his personal and professional reputations and destroyed his ability to begin a new, lucrative career as an online vintage reseller.

{¶ 15} Under the defamation per se count of his amended complaint, Newman alleged that his character and reputation have been severely damaged by Goodwill employees' false statements accusing him of insanity and mental defect and of committing crimes of threatening, harassing, and stalking. Newman further alleged that Goodwill employees committed defamation per se through their discussions with each other and with police on November 5, 2021 and via emails and documents posted in the thrift store.

{¶ 16} Newman attached three exhibits to his amended complaint. Exhibit 1 consists of two emails; the first was sent by Buchanan to several Goodwill employees on November 10, 2021. The second was sent by Jennifer Jedinak to several Goodwill employees on November 15, 2021. Exhibit 2, an email sent by Goodwill employee Lynne Leger to a Goodwill customer on August 8, 2022, outlines Goodwill's protocol for dealing with customer-related issues. Exhibit 3 is a June 27, 2022 email from a Goodwill customer to Newman asserting that Goodwill employees, including Mullens, continued to defame Newman.

{¶ 17} On July 5, 2023, Goodwill filed a motion for summary judgment on Newman's defamation claims.[1] Goodwill argued that Newman's claims fail because: (1) Goodwill employees' internal communications about Newman are not defamatory, and (2) Goodwill employees' statements to police are shielded by absolute, and, alternatively, qualified privilege. Goodwill supported its summary judgment motion with the affidavit of Trimmer and attachments thereto,[2] excerpts from Newman's deposition testimony, a recording of the interaction between Newman and Talbott in the Goodwill parking lot, and police body camera footage of Talbott's interview with police.

---

[1] Goodwill's motion for summary judgment also sought dismissal of Newman's undismissed claims for negligence, negligent infliction of emotional distress, and false light. As noted previously, Newman challenges only the trial court's dismissal of Newman's defamation claims.

[2] Trimmer's affidavit filed with Goodwill's motion for summary judgment on July 5, 2023 was not executed. On July 10, 2023, Goodwill supplemented its motion for summary judgment with Trimmer's executed affidavit.

{¶ 18} In his affidavit, Trimmer, Goodwill's Director of Loss Prevention and Safety, attested that he first learned of incidents involving Newman sometime around July 26, 2021. He could not recall any incident at the thrift store concerning violence, threats, or serious disruptions to business prior to the incidents involving Newman in 2021. During discussions with Trimmer, Goodwill employees reported confrontations between Newman and Goodwill employees and customers; these confrontations left employees feeling threatened and unsafe around Newman. As a result of these discussions, Trimmer made the decision to ban Newman from the thrift store to protect other Goodwill customers and to maintain a reasonably safe premises; he did not ban Newman from other Columbus Goodwill locations. Trimmer attested to the truth and accuracy of several documents attached to his affidavit.

{¶ 19} Regarding the exhibits attached to Trimmer's affidavit, exhibit A1 is Mullens' August 2, 2021 written summary of events involving Newman occurring at the thrift store on July 20, 22, and 26, 2021. That summary provides that on July 20, 2021, two customers reported to Mullens they had filed a police report about altercations with Newman; Mullens responded that Goodwill could not get involved in that incident because no one from Goodwill had witnessed the incident. On July 22, 2021, Mullens and Maria observed Newman recording one of the customers. When Mullens informed Newman that he could not film other customers, Newman justified his behavior by citing to an earlier incident between him and the same customer. Mullens told Newman to report any future incidents to a store manager rather than taking matters into his own hands; if he were to do so, he would be asked to leave. Later that same day, Mullens overheard Newman arguing with a different customer. Mullens told both individuals to leave the thrift store; Newman returned to the parking lot later that evening. On July 26, 2021, a customer reported that Newman was in the thrift store parking lot antagonizing customers; police were contacted. Exhibit A2 is an email exchange between Trimmer and Weisel discussing Newman's behavior at the thrift store. Trimmer advised Weisel to allow Newman to shop at the store unless he caused problems; in such event, Weisel was to tell Newman to leave the thrift store and call police if necessary. Exhibit A3 is a copy of the flyer Newman distributed in the parking lot of the thrift store containing photographs of individuals Newman alleged to have threatened him; in the flyer, Newman offers a reward for information regarding their identities. Exhibit A4 is a copy of a police report filed on July 29, 2021 following a complaint

by a Goodwill manager regarding Newman's actions. The police report includes a narrative asserting that Goodwill reported experiencing numerous instances regarding Newman harassing employees and customers while on Goodwill's property, photographing and videotaping other customers, and distributing flyers containing photographs of regular Goodwill customers offering a reward for information about those persons. The report indicates that Goodwill trespassed Newman but not in the presence of police; as such, police could not determine his identity. Police advised Goodwill to call police when Newman entered the property so Newman's identity could be verified, and police could issue a criminal trespass against him. Exhibit A5 is a copy of a police report filed on November 5, 2021 following a complaint by a Goodwill manager regarding Newman's actions. The report includes a narrative setting forth the Goodwill manager's recitation of Newman's history at the thrift store, including his encounters with Goodwill employees and customers in July 2021. The narrative noted that Newman had returned to the thrift store after having been trespassed several times and was bothering customers and filming everyone in the store. The narrative further noted Newman's creation and distribution of the flyer offering a reward for information about the identities of several regular Goodwill customers. The narrative further noted the Goodwill manager presented copies of Goodwill's trespass paperwork, which had been provided to Newman. In addition, the narrative noted that the officers were approached by several Goodwill customers who complained of altercations with Newman and averred that Newman posted videos on his YouTube page of himself posing with guns. Exhibit A6 is a copy of the document posted by Goodwill managers in the thrift store containing Newman's photograph and advising employees to immediately call police if he was seen inside or in the parking lot of the thrift store.

{¶ 20} Exhibit B is comprised of excerpts of Newman's deposition testimony taken on November 18, 2022.[3] As relevant here, Newman testified that he had been assaulted and threatened by two Goodwill customers inside the thrift store. He did not report the incidents to Goodwill employees that day.

{¶ 21} Newman filed a memorandum contra summary judgment on July 31, 2023. Newman generally argued that Goodwill's motion for summary judgment "is full of blatant lies, intentional misrepresentations, baseless accusations, and unbelievable character

---

[3] Newman appeared pro se at his deposition.

assassinations" and that Goodwill intentionally destroyed surveillance footage supporting his position. (Memo Contra at 2-3.) As to his defamation claims in particular, Newman argued that "Goodwill employees knowingly made false statements about me and acted with a completely reckless disregard to the truth or falsity of their statements" and that Goodwill employees' "negative statements about me have no factual basis in reality and they have zero corroboratory evidence to support their allegations." (Memo Contra at 4-5.) Newman also asserted that the trial court, in denying Goodwill's motion to dismiss his defamation claims, "found that I sufficiently plead [sic] claims for defamation and defamation per se" and "found that I provided a sufficient number of allegations of factual misstatements made by [Goodwill]." (Memo Contra at 9.) Newman reasoned that "[t]he same should hold true for [Goodwill's motion for summary judgment] argument." (Memo Contra at 9.)

{¶ 22} Newman supported his memorandum contra with his own affidavit and attachments thereto. In his affidavit, Newman testified that for nearly three years preceding the events at issue, he was an exemplary customer of the thrift store with no disciplinary issues. In July 2021, he was harassed and threatened by Goodwill customers. Goodwill employees refused to help him deal with threats made on his life; instead, they chose to support the customers who harassed and threatened him. He exercised his rights to protect himself by obtaining audio/video evidence that corroborated the fact that individuals involved in his lawsuit were fabricating lies about his actions and assassinating his character. He has never harassed or threatened anyone at the thrift store. Goodwill employees acted with a reckless disregard for the truth. Newman attested to the truth and accuracy of the exhibits attached to his affidavit.

{¶ 23} The exhibits attached to Newman's affidavit consist of transcriptions of his personal audio and video recordings of his interactions with various Goodwill customers and employees in July 2021; his transcription of police body camera footage of police interviews conducted with Goodwill employees Talbott and Buchanan in July and November 2021, respectively; a screenshot of an Instagram post made by a Goodwill customer; a transcription of his personal audio recording of a Goodwill customer's police report in July 2021; copies of November 2021 emails between Goodwill employees; copies of discovery requests and responses exchanged in the case; and a video compilation of his

audio and video recordings of exhibits 1E, 1G, 1H, 1I, and 1L and other video footage not included in those exhibits.

{¶ 24} On February 16, 2024, the trial court granted Goodwill's motion for summary judgment, finding that no genuine issue of material fact exists and that Goodwill is entitled to judgment as a matter of law on his defamation claims. Specifically, the trial court, relying on this court's decision in *Lee v. Upper Arlington*, 10th Dist. No. 03AP-132, 2003-Ohio-7157, found that any statements Goodwill employees made to police about Newman were absolutely privileged and thus could not form the basis of a defamation claim. As to Goodwill employees' statements about Newman in their internal communications, the trial court concluded that none of the statements were defamatory.

## II.  Assignments of Error

{¶ 25} In a timely appeal, Newman sets forth the following two assignments of error for our review:

> [I.] The trial court erred and abused its discretion by granting appellee's motion for summary judgment on appellant's defamation and defamation per se claims.

> [II.] The trial court erred and abused its discretion by depriving appellant of his constitutional right to a fair trial before an impartial judge.

## III.  Discussion

{¶ 26} In his first assignment of error, Newman argues the trial court erred when it granted Goodwill's motion for summary judgment on his defamation claims. Therefore, we set forth the standard of review applicable to summary judgment dispositions.

{¶ 27} This court reviews a decision on a motion for summary judgment under a de novo standard of review. *LRC Realty, Inc. v. B.E.B. Props.*, 160 Ohio St.3d 218, 2020-Ohio-3196, ¶ 11. De novo appellate review means the court of appeals conducts an independent review, without deference to the trial court's decision. *Wiltshire Capital Partners v. Reflections II, Inc.*, 10th Dist. No. 19AP-415, 2020-Ohio-3468, ¶ 12. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State*

*Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6.

{¶ 28} Pursuant to Civ.R. 56(C), the party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party cannot satisfy the initial burden by simply making conclusory allegations, but instead must demonstrate, including by use of affidavit or other evidence allowed by Civ.R. 56(C), that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Wiltshire Capital* at ¶ 13. If the moving party satisfies the initial burden, the non-moving party has a burden to respond, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Dresher* at 293; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991). "Requiring that the moving party provide specific reasons and evidence gives rise to a reciprocal burden of specificity for the non-moving party." *Mitself v. Wheeler*, 38 Ohio St.3d 112, 115 (1988). "A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 111 (1991), citing *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).

{¶ 29} " 'Defamation, which includes both libel and slander, is a false publication causing injury to a person's reputation, exposing the person to public hatred, contempt, ridicule, shame or disgrace, or affecting the person adversely in his or her trade or business.' " *Webber v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 17AP-323, 2017-Ohio-9199, ¶ 35, quoting *Knowles v. Ohio State Univ.*, 10th Dist. No. 02AP-527, 2002-Ohio-6962, ¶ 22. In general, slander refers to spoken defamatory words; libel refers to written defamatory words. *Id.*, citing *Holley v. WBNS 10TV*, 149 Ohio App.3d 22, 2002-Ohio-4315, ¶ 29 (10th Dist.), citing *Retterer v. Whirlpool Corp.*, 111 Ohio App.3d 847, 857 (3d Dist.1996).

{¶ 30} To establish a prima facie case of defamation, whether slander or libel, a plaintiff must demonstrate: (1) the defendant made a false statement, (2) the statement was defamatory, (3) the statement was published, (4) the plaintiff was injured as a result of the

statement, and (5) the defendant acted with the required degree of fault. *Webber* at ¶ 36, citing *Knowles* at ¶ 21, citing *Sweitzer v. Outlet Communications*, 133 Ohio App.3d 102, 108 (10th Dist.1999).

{¶ 31} " 'Actionable defamation falls into one of two categories: defamation per se or defamation per quod.' " *McClure v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 19AP-535, 2020-Ohio-1035, ¶ 11, quoting *Gilson v. Am. Inst. of Alternative Medicine*, 10th Dist. No. 15AP-548, 2016-Ohio-1324, ¶ 38, citing *Woods v. Capital Univ.*, 10th Dist. No. 09AP-166, 2009-Ohio-5672, ¶ 28. " 'Defamation per se occurs when a statement, on its face, is defamatory.' " *Id.*, quoting *Gilson* at ¶ 38, citing *Woods* at ¶ 29. "Under Ohio common law, in order to be actionable per se, the alleged defamatory statement must fit within one of four classes: (1) the words import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) the words impute some offensive or contagious disease calculated to deprive a person of society; (3) the words tend to injure a person in his trade or occupation; and (4) in cases of libel only, the words tend to subject a person to public hatred, ridicule or contempt." *Id.*

{¶ 32} "If a statement is defamatory per se, a plaintiff ' "may maintain an action for [defamation] and recover damages, without pleading or proving special damages." ' " *Id.* at ¶ 12, quoting *Woods* at ¶ 30, quoting *Becker v. Toulmin*, 165 Ohio St. 549, 553 (1956). "However, when defamation is per se, '[p]roof of the defamation itself establishe[s] the existence of some damages.' " *Id.*, quoting *Gosden v. Louis*, 116 Ohio App.3d 195, 208 (9th Dist.1996). "Where a statement is defamatory per quod, a plaintiff must plead and prove special damages." *Id.*, citing *Woods* at ¶ 30, citing *Becker* at 557. "Special damages are those direct financial losses resulting from the plaintiff's impaired reputation." (Internal quotations omitted.) *Id.*, quoting *Peters v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-1048, 2015-Ohio-2668, ¶ 7, quoting *Hampton v. Dispatch Printing Co.*, 10th Dist. No. 87AP-1084 (Sept. 13, 1988).

{¶ 33} " 'To survive a motion for summary judgment in a defamation action, the plaintiff must make a sufficient showing of the existence of every element essential to his or her case.' " *Id.* at ¶ 13, quoting *Cummerlander v. Patriot Preparatory Academy Inc.*, 86 F.Supp.3d 808, 829 (S.D.Ohio 2015), citing *Daubenmire v. Sommers*, 156 Ohio App.3d 322, 2004-Ohio-914, ¶ 79 (12th Dist.). "Whether certain statements alleged to be defamatory are actionable or not is a matter for the court to decide as a matter of law."

*Webber* at ¶ 37, citing *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, ¶ 78, citing *Yeager v. Local Union 20, Teamsters*, 6 Ohio St.3d 369, 372 (1983). "In determining whether a statement is defamatory as a matter of law, a court must review the totality of the circumstances, consider the statement within its context rather than in isolation, and determine whether a reasonable person would interpret that statement as defamatory." *Id.*, citing *Am. Chem. Soc.* at ¶ 79.

{¶ 34} Newman first contends the trial court erred in holding that Goodwill employees' allegedly defamatory statements to police are part of a judicial proceeding and therefore protected by absolute privilege. As noted above, the trial court relied on this court's decision in *Lee*, wherein we held that statements made by an individual to a prosecutor or police officer in reporting possible criminal activity are part of a judicial proceeding, thus entitling the individual to an absolute privilege from civil liability. *Lee* at ¶ 14-19. This court reaffirmed *Lee* in *Mettke v. Mouser*, 10th Dist. No. 12AP-1083, 2013-Ohio-2781, ¶ 7, and *Savoy v. Univ. of Akron*, 10th Dist. No. 13AP-696, 2014-Ohio-3043, ¶ 20.

{¶ 35} Newman contends that *Lee* was wrongly decided and urges us to instead follow *Thomas v. Murray*, 8th Dist. No. 109287, 2021-Ohio-206, which held that statements made to police officers are entitled only to a qualified privilege, and not an absolute privilege, because such statements are not made in the context of a judicial proceeding. *Id.* at ¶ 56-57. This court is bound by the doctrine of stare decisis and must follow our own court's precedent. *Three-C Body Shops, Inc. v. Francois*, 10th Dist. No. 19AP-471, 2020-Ohio-4710, ¶ 13, citing *Liberty Mut. Ins. Co. v. Three-C Body Shops, Inc.*, 10th Dist. No. 19AP-775, 2020-Ohio-2694, ¶ 13, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 16. We will not depart from the doctrine of stare decisis without special justification. *Liberty Mut. Ins. Co.* at ¶ 13, citing *State ex rel. N. Broadway St. Assn. v. Columbus*, 10th Dist. No. 13AP-963, 2014-Ohio-2196, ¶ 19, citing *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 43 (any departure from the doctrine of stare decisis demands special justification). Newman provides no compelling reason to depart from our precedent in *Lee* and its progeny, other than to argue that "it makes no sense to conclude that statements to police [are] part of a judicial proceeding and are entitled to absolute privilege. Obviously, police officers are not part of a judicial proceeding and applying absolute privilege to statements to police officers

is contrary to fairness, justice, and common sense." (Newman's Brief at 20-21.) Moreover, "[w]hile decisions from our sister districts may be persuasive and assistive, they are not binding authority on this court." *Childs v. Kroger Co.*, 10th Dist. No. 22AP-524, 2023-Ohio-2034, ¶ 37 citing *Estate of Aukland v. Broadview NH, L.L.C.*, 10th Dist. No. 16AP-661, 2017-Ohio-5602, ¶ 21.

{¶ 36} Newman also contends the trial court erred by "ignoring more appropriate and more recent case law from [this court] that holds statements regarding police officers are entitled to a qualified privilege." (Newman Brief at 19-20.) In support of his statement, Newman cites to "*Jackson v. City of Columbus, Ohio: Court of Appeals, 10th Appellate Dist. 2006.*" (Newman's Brief at 20.) We presume Newman is referring to this court's decision in *Jackson v. Columbus*, 10th Dist. No. 05AP-1035, 2006-Ohio-5209. *Jackson* is inapposite, however, as it concerned statements made in the course of an internal public safety investigation; it did not involve statements made to police in the investigation of possible criminal activity; further, there is no indication in *Jackson* that any party raised absolute privilege. Moreover, as noted previously, this court applied our holding in *Lee* in *Mettke* and *Savoy*; both were decided after *Jackson*.

{¶ 37} Newman further argues that "the trial court contradicted itself [in applying absolute privilege] because Goodwill put forth nearly the exact same argument in their [motion to dismiss] as they did in their [motion for summary judgment]. The only difference is that Goodwill changed the supporting case law in their [motion for summary judgment]. In their [motion to dismiss], Goodwill used the case of *Lasater v. Vidahl* [9th Dist. No. 26242, 2012-Ohio-4918] to support their argument of applying absolute privilege to Goodwill employees' statements to police. The trial court disagreed with *Lasater* and instead agreed with the reasoning of *Thomas*." (Newman's Brief at 17-18.) Newman's argument suggests that the trial court was bound by its decision denying Goodwill's Civ.R. 12(B)(6) motion. Newman points to no authority supporting his contention. Indeed, the standards applicable to Civ.R. 12(B)(6) and 56 motions are different. This court noted that difference in *Krukrubo v. Fifth Third Bank*, 10th Dist. No. 09AP-933, 2010-Ohio-1691:

> "A Civ.R. 12(B)(6) motion to dismiss, unlike a motion for summary judgment, merely tests the sufficiency of the complaint." *Holzman v. Fifth Third Bank, N.A.* (Apr. 30, 1999), 1st Dist. No. C-980546, 1999 Ohio App. LEXIS 1912. * * * In contrast, a summary judgment motion requires the

> non-moving party to present evidentiary materials demonstrating the existence of a genuine issue of material fact as to each element of that party's claims.

*Id.* at ¶ 3.

**{¶ 38}** Further, that the trial court was not aware of the *Lee* decision until Goodwill cited it in its motion for summary judgment does not mean the trial court erroneously applied *Lee.* As noted above, *Lee* and its progeny hold that statements made by an individual to a prosecutor or police officer in reporting possible criminal activity are part of a judicial proceeding, thus entitling the individual to an absolute privilege from civil liability. The trial court properly applied *Lee* in finding that the statements made by Goodwill employees to police in reporting possible criminal activity by Newman were absolutely privileged. Thus, the trial court properly entered summary judgment as to this aspect of Newman's defamation claims.

**{¶ 39}** Newman further contends the trial court erred in finding that the statements made by Goodwill employees about him in their internal communications were not defamatory.

**{¶ 40}** Newman first argues the trial court's conclusion is "completely contradictory to [its] decision on [Goodwill's motion to dismiss]." (Newman's Brief at 26.) Newman essentially repeats his argument that the trial court was bound by its decision denying Goodwill's Civ.R. 12(B)(6) motion—an argument we have already rejected. Further, Newman's contention that Goodwill "did not provide any new evidence in its [motion for summary judgment] that would justify the trial court to reverse the [motion to dismiss] decision" is demonstrably false. (Emphasis omitted.) (Newman's Brief at 26.) Goodwill's Civ.R. 12(B)(6) motion to dismiss properly relied only on the allegations raised in Newman's amended complaint. By contrast, Goodwill's motion for summary judgment was supported by evidence beyond the allegations raised in Newman's amended complaint, i.e., Trimmer's affidavit and exhibits appended thereto, Newman's deposition testimony, a recording of the interaction between Newman and Talbott in the Goodwill parking lot, and the police body camera footage of Talbott's interview with police.

**{¶ 41}** Newman has essentially asserted claims for libel, both per se and per quod. Newman's libel claim is based on the written emails sent by Goodwill employees Buchanan and Jedinak to other Goodwill employees on November 10 and 15, 2021, respectively, and written emails exchanged between Buchanan and Trimmer on November 5, 2021. As noted

above, Newman attached to his amended complaint copies of the November 2021 Buchanan and Jedinak emails.  In addition, in opposition to Goodwill's motion for summary judgment, Newman submitted his own affidavit, with attachments including copies of the November 2021 Buchanan and Jedinak emails and the Buchanan/Trimmer email exchange on November 5, 2021.

{¶ 42} The email sent by Buchanan to Goodwill employees on November 10, 2021 includes a photograph of Newman along with the following narrative:

> This is Larry "Mike" Newman the individual that we have been having trouble with at the outlet. He is now clean shaven. He is trespassed from our building * * *. If anyone sees him you should call 911 immediately. He was in the parking lot again today and has called the store multiple times since Friday. There is at least one police report you can reference with the police if you need to * * * .[4]

(Am. Compl., Ex. 1.)

{¶ 43} The email sent by Jedinak to Goodwill employees on November 15, 2021 also includes a photograph of Newman, along with the following statement:

> "Here is the document and photo for our Customer in the outlet. Please make sure to show it to all associates and managers. Please post in the back of both stores and at all doors in the warehouse. Managers, please make sure to review with all team members. As I state in the document, make sure that we have awareness around who is in our stores, and entering through our backrooms. There are many doors and openings in our warehouse and we all need to make sure that we stay safe * * *.

(Am. Compl., Ex. 1.)

{¶ 44} The email exchange between Buchanan and Trimmer on November 5, 2021 includes the following statements:

> [Email from Trimmer to Buchanan at 4:10 p.m.]:
>
> I have attached a Columbus Police Criminal Trespass Form. Print a few copies.  Each manager should complete one and if Mike Newman returns and refuses to leave, when you call the police you can use this to have them enforce the Criminal Trespass. If the police ask, Mike Newman was advised by Mark Trimmer, Director of Loss Prevention and Safety on

---

[4] We have deleted the police report number.

July 28, 2021 that he was not to return for the purpose of video taping or acting in a way that disturbs business.

[Email from Buchanan to Trimmer at 4:24 p.m.]:

Thanks for the paperwork. Is there anything we can do if this man is in the parking lot bothering employees or customers? Jennifer wanted me to call the police to let them know that he had been in the store today but Ive [sic] forgotten what she said. Is he legally trespassed already? I want to be able to share as much info with the police as possible. Some additional info Ive [sic] gotten from some customers is that he has a youtube channel with videos [of] him holding a gun to his head and other disturbing things so it sounds like he is very unstable.

[Email from Trimmer to Buchanan at 5:30 p.m.]:

Call the police and  ask , that's really all we can do since we don't actually own the parking lot.  We do want him to stop harassing customers and they can talk to him about that[.]

[Email from Buchanan to Trimmer at 5:31 p.m.]:

Police are here, he came back.

[Email from Buchanan to Trimmer at 6:01 p.m.]:

Spoke with the police.  They confirmed that Lindsay Honda does have a trespassing order on him for the entire property. One of the customers he is harassing actually made a menacing report in July seemed to be the sole focus again today so based upon that the police are going to go and try to make contact with him. The officers told that customer to get a protection order against him and also mentioned that employees and other customers that feel threatened would have no trouble getting one either.  A different customer says that he has a youtube channel with some disturbing videos some involving guns.  The police report number is * * * and one of the officers names is Peters badge * * *.[5]

---

[5] We have deleted the police report number.

[Email from Trimmer to Buchanan at 6:14 p.m.]:

I hope it gets and stays calm[.]

(Memo Contra Mot. for Summ. Jgmt., Ex. 1R.)

{¶ 45} As previously noted, to constitute libel per se, a false written statement must consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, impute some loathsome or contagious disease which excludes one from society, tend to injure one in his trade or occupation, or subject a person to public hatred, ridicule, or contempt. *McClure* at ¶ 11, citing *Gilson* at ¶ 37, citing *Spingola v. Stonewall Columbus, Inc.*, 10th Dist. No. 06AP-403, 2007-Ohio-381, ¶ 8. Where facts demonstrate the statements meet these criteria, general damages and malice are presumed as a matter of law. *Id.* at ¶ 12, citing *Woods* at ¶ 30, and *Becker* at 553.

{¶ 46} Review of the alleged libelous statements made by Goodwill employees in their in-house written communications reveal that none qualify as libel per se. The emails provide a photograph of Newman and discuss actions already taken or were to be taken by Goodwill employees concerning Newman's past, present and/or future behaviors involving harassing, threatening, and videotaping customers. The emails note that Newman had been trespassed from the thrift store and that a police report had been filed against him. The emails instruct employees to call police if Newman returned to the thrift store. The emails do not import an indictable criminal offense involving moral turpitude or infamous punishment, nor do they impute some loathsome or contagious disease which would exclude Newman from society. The emails do not tend to injure Newman in his trade or profession, as he had already been trespassed from the thrift store and had been so advised. Further, Newman submitted no evidence that he was precluded from thrifting for vintage items at other locations, including other Goodwill locations. The affidavit Newman submitted in opposition to summary judgment does not aver that he was precluded from shopping at other Goodwill locations. Nor do the emails tend to subject Newman to public hatred, ridicule, or contempt, as they were disseminated only to Goodwill employees. Although Newman asserts in his brief that Goodwill "plastered [his] picture all over the outlet store," Newman submitted no evidence that his photograph was viewed by anyone other than Goodwill employees. (Newman's Brief at 29.) The affidavit Newman submitted in opposition to summary judgment does not aver that persons other than Goodwill

employees were privy to Goodwill's internal communications. Accordingly, Newman presented nothing to the trial court that would create a genuine issue of fact as to whether Goodwill's internal communications constituted libel per se.

{¶ 47} Because the alleged defamatory emails do not constitute libel per se, in order to survive summary judgment, Newman was required to plead and produce evidence of special damages. *McClure* at ¶ 12, citing *Woods* at ¶ 30, citing *Becker* at 557. Special damages consist of direct financial losses resulting from the plaintiff's impaired reputation. *Id.*, quoting *Peters* at ¶ 7, quoting *Hampton*.

{¶ 48} As noted above, Newman alleged in his amended complaint that Goodwill's defamatory statements have destroyed his ability to begin a new, lucrative career selling vintage items, and that it is impossible to calculate the future damage the defamatory statements may have on his livelihood. However, Newman submitted no evidence (such as tax returns, bank records, or profit and loss statements) substantiating the financial losses he has already suffered, or will suffer in the future, arising from Goodwill's alleged defamatory emails. In light of Newman's failure to submit proof of special damages, he cannot satisfy an essential requirement of his libel per quod claim.

{¶ 49} Newman also argues under this assignment of error that the trial court did not consider relevant evidence he submitted in opposition to Goodwill's motion for summary judgment. Newman avers the trial court cited only 9 of the 20 exhibits he submitted in opposition to summary judgment. He particularly references exhibit 1S—a flash drive including the compilation of his video and audio recordings—which, according to Newman, "clearly shows that Goodwill employees made false accusations and intentionally lied about Mr. Newman." (Newman's Brief at 36.) Newman contends "the trial court didn't bother with taking the time to view ALL the relevant evidence and thus came to a decision based on a limited understanding of the evidence." (Emphasis sic.) (Newman's Brief at 35.)

{¶ 50} In *Giffin v. Crestview Cadillac*, 10th Dist. No. 09AP-278, 2009-Ohio-6569, this court addressed a similar argument. There, the appellants contended the trial court erred in ignoring an affidavit they submitted in opposition to summary judgment. We stated that "[t]he trial court never mentioned [the] affidavit in its decision, so we cannot determine whether the trial court actually considered it. In such a case, we must presume regularity, i.e., that the trial court complied with Civ.R. 56(C)'s mandate to render summary

judgment on the affidavits (and other specified evidence)." *Id* at ¶ 33, citing *Tonti v. E. Bank Condominiums, L.L.C.*, 10th Dist. No. 07AP-388, 2007-Ohio-6779, ¶ 26. "We thus presume that the trial court considered [the] affidavit, and we find no error." *Id. See also Morrissette v. DFS Servs., L.L.C.*, 10th Dist. No. 12AP-611, 2013-Ohio-4336, ¶ 44, quoting *Sadi v Alkhatib*, 10th Dist. No. 01AP-125 (Aug. 28, 2001) ("Ordinarily, however, '[i]n the absence of a record which affirmatively shows otherwise, we must presume the trial court did review all of the evidence.' "). Absent any indication to the contrary, we presume regularity in the trial court's proceedings. *Giffin* at ¶ 33. Further, this court's de novo review of the record has taken into consideration all of the materials submitted on summary judgment.

**{¶ 51}** Newman also argues under this assignment of error that the trial court abused its discretion by failing to provide him adequate time to conduct discovery prior to the court's summary judgment entry. The trial court's discovery rulings are separate from the decision granting summary judgment; thus, any error in those rulings should have been raised as a separate assignment of error. *See Mitchell v. Internatl. Flavors & Fragrances, Inc.*, 179 Ohio App.3d 365, 2008-Ohio-3697, ¶ 31 (1st Dist.). " '[P]ursuant to App.R. 12(A)(1)(b), appellate courts must "[d]etermine [an] appeal on its merits on the assignments of error set forth in the briefs under App.R. 16." Thus, generally, appellate courts will rule only on assignments of error, not mere arguments.' " *Fisher v. Univ. of Cincinnati Med. Ctr.*, 10th Dist. No. 14AP-188, 2015-Ohio-3592, ¶ 46, quoting *Camp v. Star Leasing Co.*, 10th Dist. No. 11AP-977, 2012-Ohio-3650, ¶ 69, quoting *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 65 (10th Dist.). Had Newman raised his discovery arguments specifically by assignment of error, he would have had to carry his burden of affirmatively demonstrating error and substantiating the supporting arguments. *Id.*, citing *Camp* at ¶ 67, citing App.R. 16(A)(7). Accordingly, we disregard this argument. For the same reason, we disregard Newman's argument that the trial court abused its discretion by presumptively denying his motion for leave to file a second amended complaint and his motions for sanctions against Goodwill, its employees Talbott and Trimmer, and Goodwill's trial counsel, Frank J. Reed, Jr.[6]

---

[6] We note that the trial court did not expressly address or rule on these motions. "Where a court does not explicitly rule on a motion, it is presumed to have been denied." *Webber*, 2017-Ohio-9199, at ¶ 27, fn. 1, citing *Whitmer v. Zochowski*, 10th Dist. No. 15AP-52, 2016-Ohio-4764, ¶ 39, fn. 6.

{¶ 52} For all the foregoing reasons, Newman's first assignment of error is overruled.

{¶ 53} In his second assignment of error, Newman argues he was denied a fair trial because the trial judge was biased against him.

{¶ 54} "Judicial bias is a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." (Internal quotations omitted.) *Karr v. Salido*, 10th Dist. No. 23AP-96, 2024-Ohio-1141, ¶ 47, quoting *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus.

{¶ 55} " 'A judge is presumed not to be biased or prejudiced, and a party alleging bias or prejudice must present evidence to overcome the presumption.' " *Id.* at ¶ 48, quoting *Wardeh v. Altabchi*, 158 Ohio App.3d 325, 2004-Ohio-4423, ¶ 20 (10th Dist.). " 'The appearance of bias or prejudice must be compelling to overcome this presumption of integrity.' " *Fisher* at ¶ 53, quoting *Trott v. Trott*, 10th Dist. No. 01AP-852 (Mar. 14, 2002), citing *In re Disqualification of Olivito*, 74 Ohio St.3d 1261, 1263 (1994).

{¶ 56} Newman first asserts he "is not interested in filing an affidavit of disqualification with the Supreme Court of Ohio for two reasons. One, [Newman] did not learn of this judicial bias under AFTER summary judgment was awarded to [Goodwill] and therefore [Newman] did not have the opportunity to seek disqualification of the judge through R.C. 2701.03. Two, [Newman] does not wish to disqualify the judge through an adversarial process, rather Mr. Newman just wishes for a fair trial under a different judge." (Emphasis sic.) (Newman's Brief at 52.)

{¶ 57} Citing *In re Disqualification of Zmuda*, 149 Ohio St.3d 1241, 2017-Ohio-317, Newman maintains that filing an affidavit of disqualification pursuant to R.C. 2701.03 is not the only means of challenging a trial judge based on bias or prejudice. The court recognized an alternative to the R.C. 2701.03 affidavit of prejudice for challenging alleged judicial bias. *Id.* at ¶ 11 (an affidavit of disqualification is not the "only avenue" to raise a claim of judicial bias). However, the statement was made in the context of a criminal proceeding and rejected R.C. 2701.03 as the exclusive method raising judicial bias for criminal defendants, stating "[i]t is well settled that 'a criminal trial before a biased judge

is fundamentally unfair and denies a defendant due process of law.' " *Id.*, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577 (1986).

{¶ 58} In *Karr*, this court continued to construe and apply R.C. 2701.03 as the exclusive method for raising claims of judicial bias in a civil action sounding in tort. We stated:

> This court is unable to craft a remedy for alleged judicial bias. Karr's sole avenue of relief regarding allegations of judicial bias and prejudice was to file an affidavit of prejudice with the Supreme Court clerk, pursuant to R.C. 2701.03. *Polivka v. Cox*, 10th Dist. No. 02AP-1364, 2003-Ohio-4371. We do not have jurisdiction "to vacate a trial court's judgment based on a claim of judicial bias." *Cooke v. United Dairy Farmers, Inc.*, 10th Dist. No. 05AP-1307, 2006-Ohio-4365, ¶ 45. An appellate court may reverse a judgment "if the bias or prejudice violated the defendant's right to due process and deprived the defendant of a fair hearing." *Cleveland v. Goodman*, 8th Dist. No. 108120, 2020-Ohio-713, ¶ 16.

*Id.* at ¶ 49.

{¶ 59} Even if this court had jurisdiction to vacate the trial court's judgment based on a claim of judicial bias, Newman's allegations of judicial bias are without merit. Newman first contends the trial judge should have recused himself from the case because he received $5,100 in contributions to his 2022 re-election campaign from two law firms "closely associated with Goodwill." (Newman's Brief at 54.) The Supreme Court has consistently held that contributions by law firms and/or attorneys to the judicial campaign of a presiding judge does not create a probability of bias requiring a judge's recusal. *In re Disqualification of Breaux*, 150 Ohio St.3d 1305, 2017-Ohio-7374, ¶ 10 ("under longstanding Ohio precedent and the Code of Judicial Conduct, it is not reasonable to question a judge's impartiality based solely upon counsel's or a litigant's contribution to the judge's election campaign"); *In re Disqualification of Burnside*, 113 Ohio St.3d 1211, 2006-Ohio-7223, ¶ 8 ("elected judges are generally not required to recuse themselves from cases in which a party is represented by an attorney who has contributed to or raised money for the judge's election campaign"); *In re Disqualification of Maloney*, 91 Ohio St.3d 1204 (2000) ("financial contributions and other forms of support during a judicial campaign do not raise a reasonable question regarding a judge's impartiality"). "The ability of a judge to

serve fairly and impartially in these situations is determined on a case-by-case basis." *Williams* at ¶ 10, citing *In re Disqualification of Celebrezze*, 74 Ohio St.3d 1231, 1232 (1991).

{¶ 60} The record in the present case does not create any inference of an appearance of bias or impropriety on the part of the trial judge. Newman merely posits that "[i]t would be unreasonable to think that these law firms haven't prejudicially influenced the trial court judge in some way, shape, or form. The trial court judge's re-election campaign was so close with his opponent that a recount was needed and he barely won the recount. The political contributions of the [two law firms] clearly helped the trial court judge win a very highly contested political race. The probability of actual bias on the part of the trial court judge is too high to be constitutionally tolerable, especially taken in consideration with all the other evidence of judicial bias." (Newman's Brief at 56.)

{¶ 61} Newman's arguments regarding the "other evidence of judicial bias" are also without merit. Newman first contends the trial judge did not "[give] proper time and consideration to [his] lawsuit" and "allow[ed] his personal beliefs [to] cloud his judgment." (Newman's Brief at 56-57, 62-63.) In support, Newman cites alleged comments made by the trial judge during a pre-trial conference held on January 25, 2024. Newman particularly cites two statements allegedly made by the trial judge. The first, made at the outset of the pre-trial conference, was: "Help me catch up cause I haven't looked at your case. I've been busy here." (Newman's Brief at 57.) The second, made during a discussion related to Newman's damages, was: "Hustling clothing and stuff I wouldn't necessarily consider a career. People make money at it, but to call it a career I think is a step. Okay, I mean, I'm letting my personal beliefs step in for a second. Legally, I'm still trying to understand your damages." (Newman's Brief at 62.) Newman contends that the trial judge's first statement demonstrates "the trial court judge's ignorance of the lawsuit and antagonism toward Mr. Newman" and that the second statement demonstrates that the trial judge's personal bias against Newman's chosen career field reselling vintage items clouded his judgment. (Newman's Brief at 57-58, 63.)

{¶ 62} Initially, we note that neither the audio recording of the January 25, 2024 pre-trial conference nor a transcript of same is part of our appellate record. As such, we have no way of verifying the trial judge's alleged statements. " '[I]n the absence of all the relevant evidence, a reviewing court must indulge the presumption of regularity of the

proceedings and the validity of the judgment in the trial court. It is the appellant's responsibility to include all the evidence in the appellate record so that the claimed error is demonstrated to the reviewing court.' " *State v. Justice*, 10th Dist. No. 21AP-253, 2022-Ohio-87, ¶ 5, quoting *Columbus v. Hodge*, 37 Ohio App.3d 68, 68-69 (10th Dist.1987). In the absence of evidence supporting Newman's contentions, we must indulge the presumption of regularity of the proceedings. Moreover, even if the trial court did make the alleged statements, "judicial remarks during the course of [legal proceedings] that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Karr* at ¶ 50, quoting *State v. Dennison*, 10th Dist. No. 12AP-718, 2013-Ohio-5535, ¶ 46, quoting *Pratt* at paragraph four of the syllabus.

**{¶ 63}** Newman next contends the trial court exhibited judicial bias in "allowing [Goodwill] and [its] counsel to intentionally disrupt [Newman's] discovery efforts." (Newman's Brief at 59.) Newman's argument focuses on Goodwill's alleged obstruction of the discovery process by intentionally withholding evidence from him. Newman does not argue, and the record does not reveal, that he sought intervention by the trial court or that the trial court intervened to his detriment in the discovery process in a manner that would overcome the presumption of regularly in the proceedings.

**{¶ 64}** Newman's final argument is that the trial judge exhibited bias by "not granting summary judgment cautiously." (Newman's Brief at 63.) Newman asserts that at the conclusion of the January 25, 2024 pre-trial conference, "the trial court judge clearly gives the impression that everything was set to go to trial on 2-20-24. The judge made no mention of deciding upon Goodwill's [motion for summary judgment] at any point during the pre-trial conference. Goodwill's [motion for summary judgment] was filed nearly seven months prior to the pre-trial conference. Then inexplicably, on 2-16-24, four days before the trial was scheduled, the trial court judge granted summary judgment to Goodwill." (Newman's Brief at 64.) Newman maintains that the trial judge's decision granting summary judgment to Goodwill was the "opposite of cautious. It was unjust, untimely, and reckless. * * * The trial court judge admitted [at the pre-trial conference] that he didn't have time to look at Mr. Newman's lawsuit prior to the pre-trial conference, so it is reasonable to conclude that the [motion for summary judgment] decision was made on a very biased and limited understanding of Mr. Newman's lawsuit." (Newman's Brief at 64.)

{¶ 65} Again, Newman's failure to provide on appeal the audio recording or transcript of the January 25, 2024 pre-trial conference precludes this court from verifying what actually transpired during that meeting. Further, even assuming that the trial judge was not completely familiar with all aspects of Newman's lawsuit at the time of the pre-trial conference, the trial judge did not issue the decision on summary judgment until February 16, 2024, 22 days after the pre-trial conference. In that time, the trial judge could have, and clearly did, familiarize himself with the case. Indeed, the trial court issued a thorough and well-researched 16-page decision which included recitation of the evidence and application of the relevant law to that evidence.

{¶ 66} In short, the record does not support Newman's allegations of judicial bias, and there is no " 'evidence to overcome the general presumption that a judge is fair and impartial.' " *See Karr* at ¶ 51, quoting *Dennison* at ¶ 49.

{¶ 67} For all the foregoing reasons, Newman's second assignment of error is overruled.

## IV. Conclusion

{¶ 68} Having overruled Newman's two assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.

———————